*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0069p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

————————————

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

  *v.*

DARRELL CROSGROVE,
  *Defendant-Appellant.*

No. 08-4650

————————————

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 07-00497-001—Jack Zouhary, District Judge.

Argued: January 14, 2011

Decided and Filed: March 18, 2011

Before: MERRITT, ROGERS, and WHITE, Circuit Judges.

————————————

## COUNSEL

**ARGUED:** Deborah Kovac Rump, Toledo, Ohio, for Appellant. Seth D. Uram, ASSISTANT UNITED STATES ATTORNEY, Toledo, Ohio, for Appellee. **ON BRIEF:** Deborah Kovac Rump, Toledo, Ohio, for Appellant. Seth D. Uram, ASSISTANT UNITED STATES ATTORNEY, Toledo, Ohio, for Appellee.

————————————

## OPINION

————————————

ROGERS, Circuit Judge. Darrell Crosgrove appeals his conviction and sentence for conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371, and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). Crosgrove argues that the Government did not present sufficient evidence at trial to support either conviction. Because there was sufficient evidence of a conspiracy to commit mail/wire fraud, Crosgrove's conviction for that count must be affirmed. However, the Government did

1

not produce sufficient evidence at trial to support the conspiracy to commit money laundering charge, and the judgment of conviction for that count has to be vacated. Crosgrove also contends that the district court committed several errors in evidentiary rulings, that certain evidence presented at trial was obtained in violation of the Fourth Amendment, that he received ineffective assistance of trial counsel, that the prosecutor engaged in misconduct, and that the district court committed several errors in calculating his sentence. All of these claims are without merit, forfeited, or premature, and are therefore rejected.

Darrell Crosgrove was recruited into an ongoing fraudulent insurance scheme in early 2001. He formally joined the conspiracy by accepting a "claims adjuster" position some time between March and June of 2001. The conspiracy involved the operation of two professional organizations: the American Real Estate Association ("AREA") and the Noble Group ("Noble"), both of which were created in the early nineties. AREA and Noble were marketed to real estate agents and appraisers as professional organizations that would provide members with certain benefits, most prominently errors-and-omissions insurance coverage.

AREA and Noble were owned by Mark Haukedahl, the head of the scheme, through a series of offshore shell companies. Haukedahl also owned an offshore insurance company, Midwest Insurance. Midwest was to provide an insurance policy to AREA/Noble that would provide errors-and-omissions coverage to all of the organizations' members in good standing. However, very soon after Midwest was created, Haukedahl stopped sending member dues to the company that managed Midwest's operations. Midwest fell into arrears on premium payments to its reinsurer,[1] and its policy was cancelled. By the middle of 1996, Midwest had virtually no cash on hand and no reinsurance. Therefore, there was effectively no errors-and-omissions policy in place for AREA/Noble members. The organizations' attorney, Douglas Ritson, was able to secure a genuine insurance policy for roughly six months, but by some time

---

[1]Although AREA/Noble members were told that the organizations' policies were with Midwest, Midwest was to secure insurance through a third party. That is, the actual insurance was ultimately supposed to come from another insurance company.

in 1997, there was no insurance from Midwest or any other provider to back up the coverage promised to AREA/Noble members. However, AREA/Noble continued to process member claims as though genuine insurance existed. Payouts were funded through membership fees.

Ritson, concerned about the operation's legality, eventually chose to leave AREA/Noble and approached Crosgrove about taking over Ritson's position. Crosgrove worked for Haukedahl from spring of 2001 until March 2004. During this time, Crosgrove was responsible for processing members' claims; this responsibility included meeting with Haukedahl to determine which claims should be paid and writing letters explaining the companies' frequent denials of coverage. Crosgrove sent over 150 letters to members, their attorneys, and government investigators as part of his work for Haukedahl. In some of these letters, Crosgrove identified himself as corporate counsel for AREA/Noble, in others as counsel for Midwest, and in still others as a claims adjuster. About a year into his employment with Haukedahl, Crosgrove adopted the pseudonym John Thomas, which he used in communications with members and with state insurance investigators. In July 2002, Crosgrove issued a memo to staff at AREA/Noble in which he stated that his position with the companies was unspecified, that his name should never be given to any caller, and that any calls regarding insurance should be referred to "John Thomas."

As more and more members, members' attorneys, and state insurance commissions became doubtful as to the existence of genuine insurance, Haukedahl decided to shift the assets of AREA/Noble to a new company, United Real Estate Association ("UREA"), which Crosgrove helped to create.

U.S. Marshals seized AREA/Noble's offices in March 2004, at which point the companies ceased operations. Crosgrove, Haukedahl, and Ritson were all indicted on counts related to the fraudulent insurance scheme. Crosgrove's indictment contained two counts: conspiracy to commit mail/wire fraud and conspiracy to commit money laundering. The mail/wire fraud count alleged that Crosgrove had conspired to obtain money from AREA/Noble members by means of false and fraudulent representations

and had, along with his coconspirators, "knowingly and unlawfully caused to be placed in and/or delivered by United States mail" multiple fraudulent documents related to the insurance scheme. The indictment identified several overt acts in furtherance of the mail/wire fraud conspiracy, including Crosgrove's writing of fraudulent letters to members and members' attorneys; the mailing of checks issued from member fee accounts in partial payment of claims; Crosgrove's use of an alias in dealing with AREA/Noble members, their attorneys, and insurance investigators; and Crosgrove's negotiation of monthly checks issued to him from accounts funded only by member fees.

The indictment also contained a count of conspiracy to commit money laundering, alleging that Crosgrove engaged in a conspiracy to commit promotion money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i). That is, the Government alleged that Crosgrove, "knowing that the property involved in financial transactions represented the proceeds of some form of unlawful activity, [conspired] to conduct and attempt to conduct such financial transactions affecting interstate or foreign commerce, which in fact involved the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity." The relevant transactions identified in the indictment were: 1) paying the salaries of AREA/Noble employees; 2) paying fees to companies or entities owned or controlled by Haukedahl that provided administrative services to AREA/Noble; 3) paying attorney fees to attorneys representing members of AREA/Noble; 4) disbursing settlement payments in connection with errors-and-omissions insurance claims; and 5) paying fees or salaries to coconspirators, including Crosgrove himself.

Crosgrove stood trial on both counts in mid-2008. At the close of the Government's case and again before the case was submitted to the jury, Crosgrove's trial counsel made Rule 29 motions for judgment of acquittal, both of which were denied. On appeal, Crosgrove renews the argument that there was insufficient evidence to sustain a conviction for either count.

Crosgrove also renews several evidentiary objections from his trial and raises two new trial issues on appeal: he argues that certain evidence introduced at trial was

gathered in violation of the Fourth Amendment and that the prosecutor engaged in misconduct. Crosgrove also argues that his trial counsel was ineffective and that the district court committed several errors in calculating Crosgrove's sentence.

## I. Sufficiency of the Evidence

### A. Conspiracy to Commit Mail/Wire Fraud

Crosgrove argues that there was no evidence as to his knowledge of the conspiracy. There was, however, ample evidence to support both the finding that Crosgrove knew of the conspiracy and the other elements of the mail/wire fraud conspiracy charge. At trial, the jury heard testimony from Ritson, other Haukedahl employees, the federal investigators involved in the case, an attorney Crosgrove had contacted on behalf of AREA in relation to a pending lawsuit, a friend of Crosgrove's with whom Crosgrove had discussed the nature of the insurance, state insurance investigators, and members' attorneys. This testimony, along with documents produced by the Government, supports the conclusion that Crosgrove knowingly participated in a conspiracy to commit mail/wire fraud.

Ritson, the attorney who preceded Crosgrove at AREA/Noble, testified about the structure of AREA/Noble and Crosgrove's initial involvement. Ritson had trained Crosgrove in the claims process, and testified that he had explained to Crosgrove that Haukedahl made the final decision on whether claims would be paid, that claims were paid out of an account made up of members' dues, that the associations were essentially "self-insured," and that one of Crosgrove's responsibilities in his new position would be to find a valid outside carrier. Ritson's testimony provided evidence that Crosgrove was aware, from the outset of his association with Haukedahl, that AREA/Noble was not covered by a policy from Midwest or any other outside company.

The Government also introduced a letter from the Supervisor of Insurance for Barbados informing Crosgrove that Midwest's Barbados license had been revoked a year earlier and that Midwest might be operating without a valid license in the United States. This letter was dated June 15, 2001. Taking the trial evidence in the light most favorable

to the Government, Crosgrove began working at AREA/Noble no later than late-May 2001. Therefore, the jury could have concluded from the Barbados letter that Crosgrove had notice within weeks of beginning work at AREA/Noble that the company had no valid outside carrier.

Terry Lodge, an attorney who had formerly served as outside counsel to AREA/Noble, testified during the Government's case in chief. Lodge testified that Crosgrove never produced a copy of the insurance policy between Midwest and AREA, in spite of Lodge's repeated requests. The jury also heard several former AREA/Noble employees testify that they had never met or spoken with anyone from Midwest. A jury could reasonably conclude that if Crosgrove was unable to produce proof of a policy with Midwest and there was no contact between AREA/Noble and Midwest, Crosgrove must have been aware that Midwest was not truly providing outside insurance.

There was also ample evidence that Crosgrove willingly continued his participation in the scheme in spite of its illegality. In a note to Troy Haukedahl, Mark Haukedahl's son, Crosgrove wrote: "Here is the updated policies [sic]." The note went on to state: "The changes I have made to the policy are highlighted and underlined." Of course, if the policy were actually provided by an outside entity, AREA/Noble would not modify the policy's contents before sending it to members. Crosgrove's revisions to the fraudulent policy, which was purportedly underwritten by Midwest, support the finding that he took an active role in the AREA/Noble fraud scheme.

The Government also presented evidence that Crosgrove had instructed staff not to give out any information about Midwest, not to inform any callers that Midwest was an offshore entity, and not to give out his name to any caller. Additionally, Crosgrove used his John Thomas alias to respond to investigators from multiple state insurance departments. There was further evidence that Crosgrove repeatedly varied his statements regarding his position with the AREA/Noble/Midwest entities and the structure of the companies in dealings with members, members' attorneys, and investigators. In September 2001, Crosgrove wrote a letter to a member's attorney stating: "As to the status of Midwest, I can't say, as I have no idea of whom you are

talking about." Three weeks later, Crosgrove wrote a letter to a different member's attorney in which he claimed to represent Midwest. An investigator from the Montana Insurance Commission testified that Crosgrove wrote to her that AREA/Noble records were no longer available because "a competing company came in and took over the customers as new accounts." Yet other evidence revealed that UREA was not a pre-existing competitor, but rather a new company created solely for the purpose of transferring AREA/Noble assets, and that Crosgrove himself had written the memorandum of sale. Based on this evidence, a reasonable jury could conclude that Crosgrove willingly participated in efforts to conceal the fraud scheme and shield AREA/Noble's remaining assets from investigators.

All of this evidence, taken in the light most favorable to the Government, supports the conclusion that any rational finder of fact could have found beyond a reasonable doubt that Crosgrove knowingly and willingly participated in the conspiracy to commit mail/wire fraud. Crosgrove's conviction for this count is amply supported by the evidence.

*B. Conspiracy to Commit Money Laundering*

Although trial evidence was sufficient to support Crosgrove's conviction for conspiracy to commit mail/wire fraud, the Government did not produce sufficient evidence to support the charge of conspiracy to commit money laundering. The Government failed to show that the money involved in the alleged transactions represented the profits of unlawful activity, as required under *United States v. Santos*, 553 U.S. 507, 514 (2008), and *United States v. Kratt*, 579 F.3d 558, 561-62 (6th Cir. 2009). Crosgrove's conviction for this count must therefore be vacated.

The indictment alleged that Crosgrove conspired to participate in promotion money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i). "Promotion" money laundering involves the reinvestment of proceeds of unlawful activity into the illegal scheme from which the proceeds were derived. The charge required the Government to prove that Crosgrove "conspired to conduct a financial transaction which involved the proceeds of unlawful activity, with knowledge that the money was the proceeds of

unlawful activity, and with the intent to promote the underlying criminal activity." *United States v. Reed*, 264 F.3d 640, 650 (6th Cir. 2001). To secure a conviction for promotion money laundering, the Government must identify transactions (or planned transactions in the case of a conspiracy charge) that represent the proceeds of the underlying illegality. Although the indictment listed several categories of transactions as bases for the money laundering charge, the Government's attorney stated at oral argument that the only transactions on which the conviction could be upheld were Crosgrove's deposits of checks that were issued to him from the member fees account. These were monthly checks for pre-established, fixed amounts and can be fairly characterized as salary payments.

The jury returned a guilty verdict on June 3, 2008, one day after the Supreme Court issued its decision in *Santos*. Although it is understandable that the impact of the *Santos* decision was not considered at trial, the decision's interpretation of the promotion money laundering statute, as understood in this circuit, nonetheless controls this case. Because Crosgrove's money laundering and mail fraud charges merge, and the money laundering charge carries a substantially higher statutory maximum than the mail/wire fraud charge, the Government was required to show that the proceeds involved in the charged transaction represented AREA/Noble profits and not just gross receipts. *Kratt*, 579 F.3d at 562.

*Santos* involved a collateral appeal from a conviction of promotion money laundering. The underlying criminal activity in *Santos* was the operation of an illegal lottery, for which Santos had also been convicted. Similar to the checks issued to Crosgrove, the transactions used to support the money laundering charge in *Santos* were lottery payouts and payments of employee wages. Santos argued that such transactions could not serve as the basis for a promotion money laundering conviction because they were normal expenses, rather than profits, of the criminal enterprise. The issue in the case was whether the term "proceeds," as used in 18 U.S.C. § 1956, refers to gross receipts or profits. Although no opinion commanded a majority of the Court, Santos' money laundering conviction was reversed on the basis that, at least in the context of

Santos' case, "proceeds" must mean profits and not merely receipts. Further, because payouts of winnings and employee wages were essential to operating a lottery, those transactions identified by the Government could not be said to represent the profits of the enterprise.

Prior to *Santos*, this circuit interpreted "proceeds" to mean gross receipts, an interpretation that would support Crosgrove's conviction. *United States v. Haun*, 90 F.3d 1096, 1101 (6th Cir. 1996). Post-*Santos*, this circuit concluded that proceeds means profits for cases that fall within a certain framework, but continues to mean receipts for all other cases. "'Proceeds'. . . means profits only when the § 1956 predicate offense creates a merger problem that leads to a radical increase in the statutory maximum sentence and only when nothing in the legislative history suggests that Congress intended such an increase." *Kratt*, 579 F.3d at 562. Crosgrove's case falls within this framework, and it is therefore not sufficient to show only that he was paid out of gross receipts of the insurance scheme. Rather, the Government would have to have shown transactions (or conspiracy to engage in transactions) that involved the profits of the scheme, a burden it did not meet.

Under the *Santos-Kratt* framework, a merger problem arises when defining "proceeds" as "receipts" automatically makes commission of the predicate offense a commission of money laundering and where the predicate offense carries a much lower statutory maximum sentence than the associated money laundering charge. *Kratt*, 579 F.3d at 563. In Crosgrove's case, the statutory maximum for conspiracy to commit mail/wire fraud was five years, while the statutory maximum for conspiracy to commit money laundering was twenty years. Because the money laundering conspiracy charge significantly increased Crosgrove's exposure to prison time, it is necessary to determine whether the predicate offense and the money laundering charge merged.

The *Kratt* opinion suggests that it is possible to sort predicate offenses into distinct merger and non-merger categories, 579 F.3d at 563, but at least one other circuit has called this into question, *United States v. Van Alstyne*, 584 F.3d 803, 815-16 (9th Cir. 2009). In *Van Alstyne*, the Ninth Circuit stated that the "analysis of the 'merger'

problem in the mail fraud context must focus on the concrete details of the particular 'scheme to defraud,' rather than on whether mail fraud generally requires payments of the kind implicated in *Santos*." *Id.* at 815. The court then determined that two of the defendant's mail fraud counts merged with his money laundering charge but a third did not. *Id.* at 815-16. It is not necessary to decide in this case whether the merger analysis requires a case-by-case or categorical approach, however, because the crimes as charged obviously merge. Most notably, the payments Crosgrove received for his services as an attorney and claims adjuster, which the Government states are the only basis for upholding Crosgrove's conviction for conspiracy to commit money laundering, are also listed in the indictment as overt acts in furtherance of the mail/wire fraud conspiracy. *See United States v. Moreland*, 622 F.3d 1147, 1166 (9th Cir. 2010). The indictment itself, therefore, reveals the Government's position that the conspiracy to commit mail/wire fraud would, without any additional action by Crosgrove, also constitute a money laundering conspiracy.

Crosgrove's charges of conspiracy to commit mail/wire fraud and conspiracy to commit money laundering merge, and the money laundering charge carries a far heavier statutory maximum than the mail/wire fraud charge. Further, we have found nothing in the legislative history to indicate that Congress intended this result for the predicate crime of mail/wire fraud unrelated to narcotics trafficking. Therefore, the profits definition of "proceeds" must apply to this case. Much as payments to the runners in an illegal lottery operation are essential to the operation of a lottery, and therefore are transactions involving receipts rather than profits, payments to a "claims adjuster" are essential to the operation of a fraudulent insurance scheme. Just as someone has to collect money from lottery participants in order for the lottery to exist, someone must at least purport to represent the claims department of an insurance operation in order for the operation to appear legitimate.

It is certainly possible that a conspirator serving as a claims adjuster could receive profits of the predicate offense rather than just proceeds, but that is not this case, at least not as presented by the Government. Crosgrove's pay was not linked to the

amount of fees collected, the value of claims denied, the net receipts after settlement payments, or any other metric that would indicate he was extracting a share of AREA/Noble's profits. There may be an argument that someone in Crosgrove's position could receive such a high fixed payment that, even if it were characterized as a "salary," it obviously represented profits of the enterprise. However, no such evidence was presented in this case, and the monthly payments Crosgrove received (in amounts of $2,500, $3,000, and $3,500) do not appear exceptional and cannot be construed as anything more than payments for services rendered. Because the Government did not show that these payments were made from profits, the conspiracy to commit money laundering charge cannot be upheld.

Although Crosgrove raised a claim of insufficient evidence in his initial brief, he based that claim entirely on his contention that the Government had failed to prove he had the requisite knowledge to support a conviction for either conspiracy. Crosgrove mentions *Santos* only in his reply brief, and even then only in the context of the claim that he had not knowingly participated in a conspiracy. The reply brief does not discuss the receipts-profits distinction or the merger issue. At oral argument, the Government contended that the *Santos* argument should be deemed forfeited because, to the extent it was raised at all, it was only in the reply brief and the Government had not been provided the opportunity to respond. However, Crosgrove did make an insufficiency of the evidence claim before the trial court and in his initial brief, so the Government was at least aware of the general claim. Further, while his initial brief emphasizes the Government's failure to prove Crosgrove's knowledge, it also asserts that Crosgrove was merely an employee of the scheme and argues specifically that the Government failed to prove "Crosgrove knew the property represented proceeds of unlawful activity, and he had 'intent to promote the carrying on' of that activity." Therefore, Crosgrove may have, albeit inartfully, put all aspects of the money laundering charge into issue in his initial brief.

Even if Crosgrove did fail to raise a *Santos* claim, however, this court may nonetheless reverse the conviction in the interest of justice. *United States v. Graham*,

275 F.3d 490, 521-22 (6th Cir. 2001).  Such reversal requires a finding of plain error, meaning (1) error, (2) that is plain, (3) that affects substantial rights, and (4) seriously affects the fairness, integrity or public reputation of the judicial proceedings.  *Id.* at 522.  Crosgrove's conspiracy to commit money laundering conviction rises to this standard, and vacatur of his conviction is appropriate even though his briefs are not thoroughly developed.

Allowing both the mail/wire fraud and money laundering counts to proceed to the jury satisfies the first and second prongs of the plain error test.  First, the merger problem discussed above shows that it was error to submit the money laundering conspiracy charge to the jury when there had been no showing of profit-based transactions.  However, this conclusion is based on the *Santos-Kratt* framework, which was not available to the district court.  The *Santos* opinion was released just one day before the jury instructions were issued, and the *Kratt* opinion was not issued by this circuit until over a year later.  Therefore, the district court's denial of Crosgrove's Rule 29 motions is understandable.  However, the requirement that the error be plain means "plain under current law." *Graham*, 275 F.3d at 522.  For plain error review, current law "is the law as it exists at the time of review."  *United States v. Calloway*, 116 F.3d 1129, 1136 (6th Cir. 1997) (citations omitted); *see also Johnson v. United States*, 520 U.S. 461, 468 (1997); *Moreland*, 622 F.3d at 1166.  Because this case clearly falls within the *Santos-Kratt* framework at the time of appellate review, the error is plain.

Because the error resulted in a prison term longer than that to which Crosgrove could permissibly be sentenced were he convicted for only the mail/wire fraud conspiracy, his substantial rights were affected.  *See United States v. Story*, 503 F.3d 436, 440 (6th Cir. 2007).  The final factor for plain error review—whether the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings—is within this court's discretion to decide.  *United States v. Hamm*, 400 F.3d 336, 340 (6th Cir. 2005).  The integrity of judicial proceedings is affected when a defendant's prison term is lengthened as a result of a conviction unsupported by trial evidence. Therefore, the fourth factor for plain error review is also satisfied, and it is

appropriate to vacate Crosgrove's conviction for conspiracy to commit money laundering.

## II. Evidentiary Objections

Crosgrove raised several evidentiary objections at trial that remain relevant given our affirmance of his conviction for conspiracy to commit mail/wire fraud. As discussed below, we uphold the district court's rulings on each of these claims.

### A. *Barbados Letter*

Crosgrove argues that the letter from the Supervisor of Insurance of Barbados, which was addressed to Crosgrove at the AREA/Noble offices and found among AREA/Noble documents, was improperly admitted. Crosgrove's main arguments are that the letter is hearsay and was never properly authenticated, but he also mentions that no chain of custody was established. The letter, however, was not hearsay and was adequately authenticated, and Crosgrove's newly raised chain-of-custody argument does not suggest plain error.

Crosgrove argues that the Barbados letter was the "linch-pin" of the Government's case, because it "was the only tangible evidence that there was no insurance." Therefore, Crosgrove appears to contend, the letter was offered into evidence to prove that there was no insurance, making the letter hearsay not within any exception. The Government responds that the letter was not hearsay, because it was not used to show that there was no insurance, but rather that Crosgrove was on notice at or near the outset of his employment with Haukedahl that there may not have been a valid insurance policy. Crosgrove's own statements ultimately support the Government's position. In his reply brief, Crosgrove states that "the government was specifically using the Barbados letter to prove that Crosgrove had notice that there were issues with the underlying insurance."

As part of its case, the Government had to show that Crosgrove knew of the illegality of the insurance scheme. Because "[i]t is axiomatic that the hearsay rule only excludes extrajudicial statements when they are offered to prove the truth of the matter

asserted," *Kuklica v. City of Cleveland*, No 84-3991, 1986 WL 17706, at \*5 (6th Cir. Sept. 15, 1986), the district court did not abuse its discretion by admitting the letter for the purpose of showing notice.  In fact, Crosgrove's argument on appeal that the letter was the Government's only tangible evidence that there was no insurance is off target, since Crosgrove has never argued that valid insurance existed and his trial counsel conceded that a conspiracy existed between Haukedahl and Ritson.  Because the illegality of the scheme was not in issue, the letter's relevance was predominantly to show notice, an admissible purpose for the use of out-of-court statements.  *Id.*; *United States v. Jefferson*, 650 F.2d 854, 858 (6th Cir. 1981).

Crosgrove's argument that the letter was not properly authenticated is also without merit.  "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  Fed. R. Evid. 901(a).  Crosgrove argues that the Government did not properly authenticate the letter because no one from Barbados identified the letter as an authentic document.  This argument ignores that "proponents of exhibits may also prove their authenticity with circumstantial evidence." 1-8 Weinstein's Evidence Manual § 8.01.  At trial, Ritson testified that he received a very similar letter at his law office at an earlier date and had notified the appropriate party that the letter should be addressed to Crosgrove.  In addition to this testimony, Crosgrove acknowledges that the letter was found among the documents seized from the AREA/Noble offices.  Ritson's testimony that he, AREA/Noble's former counsel, had received a similar letter and had subsequently conveyed Crosgrove's name and position to that letter's sender, combined with the fact that the letter addressed to Crosgrove was found among AREA/Noble documents, was sufficient to authenticate the letter for the limited purpose of showing notice.

On appeal, Crosgrove mentions that no chain of custody was established for the Barbados letter.  This argument was not raised at trial and is not developed on appeal. Crosgrove appears to be referring to the fact that no one testified as to what happened to the letter after it was seized from AREA/Noble offices.  Before trial, however, the

parties stipulated to locations where government agents found many government exhibits maintained in the AREA/Noble offices, and agreed that there would not need to be testimony on those facts for each document. Given that Crosgrove's trial counsel stipulated to the location of AREA/Noble documents, the chain-of-custody argument is particularly weak, and certainly does not survive plain-error review. *See United States v. Thomas*, 38 F. App'x 198, 203 (6th Cir. 2002) (citing *United States v. Collins*, 78 F.3d 1021, 1033 (6th Cir. 1996)).

Crosgrove's brief makes several other points with regard to the letter, including: there is no evidence that Crosgrove ever read the letter, a government informant testified that he never saw the letter in the office that he shared with Crosgrove, and Haukedahl may have hidden (or even written) the letter. All of these arguments go to the weight the jury should afford the evidence, not to its admissibility. Trial counsel was able to raise each of these points at trial, both through cross examination and closing arguments. Therefore, the district court did not commit error by admitting the Barbados letter into evidence.

*B. Adult Entertainment References*

At trial, the Government elicited testimony from several witnesses about Crosgrove's interest in the adult entertainment industry, with the purpose of establishing his motive for participating in the conspiracy. The district court did not commit an abuse of discretion in admitting this evidence on the grounds that its probative value was not substantially outweighed by its potential prejudicial effect. *See United States v. Ashraf*, 628 F.3d 813, 826 (6th Cir. 2011) (scope of review).

The Government argued that Crosgrove had two motives for joining and continuing in the conspiracy: improving his short-term financial situation and launching future adult entertainment ventures with Haukedahl. Haukedahl already owned some adult entertainment businesses and planned to expand this segment of his portfolio, and the Government contended that Crosgrove continued working with Haukedahl in the hopes of partnering with him in these endeavors.

Crosgrove characterizes the adult entertainment references as "improper character evidence repackaged as relevant to motive," and argues that the district court erred in allowing any references to adult entertainment at trial. Although Federal Rule of Evidence 404 generally prohibits the use of past crimes, wrongs, or acts to show action in conformity therewith, the rule allows the use of such evidence to show a defendant's motive. Fed. R. Evid. 404(b). Crosgrove contends, however, that motive is not an element of the crimes charged, suggesting that evidence of motive is therefore irrelevant. But the fact that motive is not an element of either of the crimes for which Crosgrove was charged does not make evidence of motive irrelevant. "Motive is not an element of most crimes, but the state is usually entitled to prove motive because motive explains the reason for an act and can be important to a required state of mind." 22A C.J.S. Criminal Law § 992.

Crosgrove next argues that even if evidence of motive was relevant, there was other evidence that would not have the same prejudicial effect, making the adult entertainment references merely cumulative. Crosgrove identifies Ritson's testimony that Crosgrove was barely getting by in his solo DUI practice as the other evidence of financial motive that obviated any need for the adult entertainment references. But the testimony about Crosgrove's financial straits at the time he joined the scheme did not serve the same purpose as the adult entertainment testimony, because the larger potential revenues that could come from the prospective ventures is relevant to Crosgrove's motive for continuing in the conspiracy despite mounting evidence of its illegality. Therefore, the evidence relating to Crosgrove's interest in the adult entertainment industry was not merely cumulative.

Although the adult entertainment evidence may have had some prejudicial effect, that effect would have to substantially outweigh the evidence's probative value before exclusion would be appropriate. Fed. R. Evid. 403. Here, because the financial prospects of working with Haukedahl are very probative of motive, the prejudicial effect would have to be great to justify exclusion. *See United States v. Cody*, 498 F.3d 582, 590-91 (6th Cir. 2007). In *Cody*, this court upheld the admission of testimony about the

defendant's cocaine use because his drug addiction and related debts revealed his motive for committing bank robbery. Cocaine use, as opposed to running adult entertainment businesses, is clearly illegal.[2] Nonetheless, because the drug use was "inextricably intertwined" with the crime at issue, the evidence was admitted. *Id.* at 591.

This court has also affirmed a trial court's admission of evidence of a defendant's interest in adult entertainment as proof of motive. *United States v. Murray*, 152 F. App'x 492, 494-95 (6th Cir. 2005). In *Murray*, the Government was allowed to present evidence of the defendant's lavish lifestyle, including the fact that he frequented strip clubs, to show that he had a motive to continue committing bank fraud to support his spending. *Id.* Murray, like Crosgrove, argued that this evidence was both unfairly prejudicial and cumulative. *Id.* This court rejected both arguments. *Id.* at 495.

It is also worth noting that the trial court took steps to minimize the prejudicial effect of the adult entertainment references. *See United States v. Thomas*, 74 F.3d 676, 678-80 (6th Cir. 1996). At jury selection, the district court asked potential jurors whether they would have any problem with the fact that the defendant may have had some involvement or interest in the adult entertainment industry. Further, during jury instructions, the district court reminded the jurors that testimony about Crosgrove's interest in pornography was to be considered "only as it relates to the government's claim of defendant's motive and opportunity to join and remain in the conspiracy."

Because the evidence of Crosgrove's interest in the adult entertainment business is highly relevant to motive, and because its harmful effects do not substantially outweigh its probative value, the district court did not abuse its discretion in admitting the evidence.

---

[2]At least one of Crosgrove's planned adult entertainment businesses, an escort service, was illegal. However, the district court did not allow the Government to introduce evidence of this aspect of Crosgrove's plans, and instead limited testimony to more general statements about "adult entertainment," a term that could include legal business pursuits.

*C. Exclusion of Proposed Witness*

At trial, Crosgrove sought to have John Murphy, an expert on domestic insurance companies and captive offshore insurance companies, testify about the general framework of claims processing and the procedure that a claims adjuster or insurance company would follow in denying a claim on the basis of fraud, and provide some information on captive insurance companies. The trial court, however, determined that because Murphy had no knowledge of the file in Crosgrove's case or of claims processing specific to AREA/Noble/Midwest, Murphy's testimony most likely did not meet the relevancy threshold of Federal Rule of Evidence 401. The district court went on to state that even if the testimony would satisfy Rule 401, it should be excluded under Federal Rule of Evidence 403 because of the likelihood that it could confuse or mislead the jury.

On appeal, Crosgrove argues that the trial court abused its discretion in excluding Murphy's testimony. Crosgrove contends that the testimony was clearly relevant because "Murphy would have offered the jury an expert's understanding of how claims adjusters operate thereby neutralizing the government's case." Crosgrove also states that Murphy would have testified that insurance adjusters routinely use aliases, thereby minimizing the strength of the Government's evidence relating to Crosgrove's use of the John Thomas pseudonym. However, a review of the record has not revealed that Crosgrove's trial counsel stated that Murphy would testify as to the standard use of aliases in the field of claims adjustment, and Crosgrove's appellate counsel was unable to direct the panel to such a statement in the record. Therefore, to the extent the claim of error is based on the rationale that Murphy's exclusion precluded Crosgrove from presenting his defense as to the standard use of aliases, the claim fails, as no plain error occurred.

As to the relevancy of the other subjects to which Murphy would testify, the primary testimony which Crosgrove's trial counsel claimed Murphy would provide—that captive insurance companies can be legal—was elicited from other witnesses and conceded by the Government in closing arguments. Further, the case was

not about whether AREA/Noble's operations could have been legal if the entities were honest with their members.  Rather, the case turned on whether Crosgrove was aware that AREA/Noble did not operate in the manner described to members and whether he participated in efforts to misrepresent the companies' insurance structure.  Because Murphy was not prepared to testify with any specificity as to AREA/Noble's structure, there is no basis for Crosgrove's claim that the district court abused its discretion in excluding Murphy's testimony.

*D.  Instant Messages*

At trial, the Government introduced parts of an instant-message conversation between Crosgrove and his friend Brian Crawford.  In these messages, Crawford complained about his financial situation, and Crosgrove responded: "Well, like I said, if you want to get back to Toledo and abandon your morals, let me know.  I have work for you."  At trial, Crosgrove sought to introduce other instant-message conversations with Crawford in which he wrote that he had become convinced that the insurance setup was not a scam, but the Government argued that those non-inculpatory statements were hearsay not within any exception.  (The admitted statements, although made out-of-court, were non-hearsay admissions of a party opponent.)  Crosgrove argues that the common law rule of completeness compels admission of the remaining messages to allow him to put the admitted statements in context.

The doctrine of completeness, partially codified in Federal Rule of Evidence 106, "allows a party who is prejudiced by an opponent's introduction of part of a document, or a correspondence, or a conversation, to enter so much of the remainder as necessary to explain or rebut a misleading impression caused by the incomplete character of that evidence." *United States v. Howard*, 216 F. App'x 463, 472-73 (6th Cir. 2007) (internal citations and quotations omitted).  This circuit has  stated, however, that the doctrine "does not make inadmissible evidence admissible." *Id.* (internal citations omitted); *see also United States v. Costner*, 684 F.2d 370, 373 (6th Cir. 1982); *United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996).  Therefore, unless the messages Crosgrove sought to introduce were truly necessary to correct a "misleading impression caused by

the 'incomplete character'" of the portion of the statement admitted, the evidence was not admissible. *Howard*, 216 F. App'x at 472. Here, the statements Crosgrove sought to introduce were part of an instant-message conversation that took place weeks before the one testified to by Crawford. Thus, the admission of the messages could not have been necessary to correct a misleading impression, and there was no error.

Crosgrove argues that the court's refusal to allow him to introduce additional instant messages prevented him from testifying. Although the transcript does reflect that Crosgrove chose not to testify after the ruling on the instant messages, he has not explained why his decision not to testify resulted from the district court's ruling or why it should lead this court to depart from its interpretation of Rule 106. Therefore, the district court did not err in excluding the instant messages.

### E. Lonas Testimony

AREA/Noble's former marketing director, Grace Lonas, testified that she had once asked Darrell Crosgrove, Mark Haukedahl, and Tim Foreman (another employee) about all the complaints the company was receiving, and that one of them (she thought Haukedahl) responded that there was no insurance or insurance company, and the others laughed. On cross-examination, Crosgrove's trial counsel had Lonas acknowledge that she had not mentioned this conversation in either of her interviews with government investigators. Lonas testified that she had disclosed the contents of the statement in her "third interview," which was revealed to be her trial preparation session with the prosecutor and two government investigators. Crosgrove argues that the district court should have stricken this aspect of Lonas's testimony because of a Jencks Act violation, but his argument misstates the district court's ruling and is without merit.

At the first opportunity outside the presence of the jury, Crosgrove's trial counsel raised concerns about the fact that he had not received any information about this aspect of Lonas's testimony before trial. Trial counsel initially articulated his concern that this was "unfair" but did not identify any rules of evidence that would require prior disclosure. The prosecutor stated that there were no agent notes from the trial preparation meeting, and that his own outline of the meeting was non-discoverable work

product. Crosgrove's trial counsel never made a formal motion to have the prosecutor's documents reviewed in chambers, but he did eventually contend that the withholding of the prosecutor's outline of the session was a violation of the Jencks Act, 18 U.S.C. § 3500, which requires that the Government provide the defendant with statements made by Government witnesses. Trial counsel moved for a mistrial or, alternatively, that Lonas's testimony be stricken. The trial court denied this motion.

The district court explained that the Jencks Act does not provide for a "work product" exclusion for statements made to federal prosecutors, and the interview outline could not be withheld on work product grounds. However, the district court said that it did not have reason to believe that the Act's definition of "statement" was satisfied in this case, because there was no evidence that there was a "substantially verbatim recital of an oral statement made by the witness and recorded contemporaneously with the making of the statement." Because there was no Jencks material, there was nothing for the Government to turn over. The district court further stated that the defense had ample opportunity to call the credibility of the testimony into question by revealing the time delay between Lonas's initial contact with the Government and her relaying of this story to the prosecutor.

In his brief, Crosgrove argues that the district court "abused its discretion by finding [Lonas's] statement to be work product and therefore not discoverable as Jencks material." This claim misstates the trial court's findings, as the district court clearly stated that there was no work product exception to the Act's disclosure requirements. Crosgrove does not argue that the court's actual finding that the prosecutor's outline did not amount to Jencks material was erroneous. Further, there is no argument as to the harm Crosgrove suffered as a result of not receiving the memo. The Act is meant "to facilitate meaningful cross-examination." 1 Crim. Prac. Manual § 20:4. Yet, Crosgrove's trial counsel was able to meaningfully cross examine Lonas about the statement and otherwise call Lonas's credibility into question through examination of the investigators who had previously interviewed her. Therefore, the trial preparation outline would be helpful only if it contained no reference to the conversation to which

Lonas testified. Crosgrove has never argued a belief (or even hinted at the possibility) that the document would reveal such an inconsistency. Because Crosgrove misunderstands the district court's findings and has not articulated other grounds for arguing a Jenks Act violation, he has not shown that the district court committed error in denying his motions related to Lonas's testimony.

## III.  Fourth Amendment Claim

Crosgrove claims that evidence collected by Tim Foreman, who worked with Crosgrove at AREA/Noble, was improperly obtained because Foreman was a state actor by virtue of being a paid informant. Crosgrove made no pre-trial suppression motion with regard to evidence procured by Foreman, and Crosgrove has therefore forfeited that claim on appeal. Crosgrove acknowledges that his Fourth Amendment claim is new, but contends that plain-error review should apply. The Government has responded to this claim on the merits, arguing that Crosgrove had no expectation of privacy in AREA/Noble's records. We find no plain error.

## IV.  Ineffective Assistance of Trial Counsel

Crosgrove asserts that his trial counsel was ineffective in: failing to raise Fourth Amendment objections to certain evidence, failing to supply requested research to the trial court, not filing a trial brief, not timely objecting to certain witness questioning, failing to make an attorney-client privilege objection to the testimony of another attorney, and trying to intervene in forfeiture proceedings rather than focusing on sentencing preparation.

This court generally will not review claims of ineffective assistance of counsel on direct appeal. *United States v. Williams*, 612 F.3d 500, 508 (6th Cir. 2010). Although an exception to this rule exists where the record is sufficiently developed to support the claim, conclusory assertions of ineffective assistance are not adequate. *United States v. Winkle*, 477 F.3d 402, 421 (6th Cir. 2007). Crosgrove has not explained how the record is sufficiently developed to support his argument, and error is not

apparent from the record.  *See id.*  Therefore, Crosgrove's ineffective assistance of counsel claim is premature.

## V.  Prosecutorial Misconduct

Crosgrove argues that the prosecutor repeatedly asked improper leading or hearsay questions of witnesses and that the closing argument and rebuttal were filled with "vouching, personal attacks, and misstatements of evidence."  However, with only one exception (discussed below), Crosgrove has identified neither  specific questions that demonstrate prosecutorial misconduct nor examples of improper statements during closing and rebuttal.  Instead, Crosgrove "asks this Court to read [the closing argument and rebuttal] in their entirety."  Because there is no developed argumentation in these claims, the panel declines to address Crosgrove's general assertions of misconduct in witness questioning and closing statements.  *See, e.g.*, *United States v. Watkins*, 179 F.3d 489, 500-01 (6th Cir. 1999).

Crosgrove does articulate one specific argument with regard to prosecutorial misconduct: that the prosecutor improperly stated that shredded documents found in the dumpster behind Crosgrove's office were likely AREA/Noble papers that Crosgrove had previously stored at his home and sought to dispose.  The shredded papers were admitted into evidence, but because the Government did not reconstruct the documents there was no evidence that they were actually tied to AREA/Noble (although there was evidence to link the documents to Crosgrove).  However, because prosecutors may argue reasonable inferences from the evidence and because the court emphasized that closing arguments are not evidence, this claim of prosecutorial misconduct fails.

A prosecutor has "leeway to argue reasonable inferences from the evidence" during closing arguments.  *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) (internal citations omitted).  The prosecutor's statements about the documents represented reasonable inferences that could be drawn from the appearance of shredded materials in Crosgrove's dumpster four days after his offices were searched.  This court's precedent clearly supports a determination that the suggested inferences do not amount to prosecutorial misconduct.

In *Byrd*, the defendant was accused of murder, and while the Government had recovered some of the clothing related to the crime, it had not recovered a missing shirt sleeve. During closing arguments, the prosecutor stated "we are missing a sleeve, and I will tell you where that sleeve is. It is out in Hamilton County in the northwest side with blood all over it." *Id.* at 536. The defendant argued that this statement amounted to prosecutorial misconduct, but this court found that the statement "constitute[d] arguably reasonable inferences from the evidence presented at trial." *Id.* The logical inference suggested in this case is no more of a stretch than that made by the prosecutor in *Byrd*, and the statement itself is far less inflammatory. Therefore, the case law does not support Crosgrove's argument that the prosecutor's statements about the nature of the shredded materials amount to prosecutorial misconduct.

In addition, even if the prosecutor's comments about the shredded documents were improper, this court has held that the trial court can generally correct such improprieties by instructing the jury that closing arguments are not evidence. *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001). Before closing arguments, the judge clearly instructed the jury that: "The evidence does not include the indictment, opening statements, or closing arguments of counsel. The opening statements and closing arguments of counsel are designed to assist you. They are not evidence." Therefore, even if the statements had been improper, that impropriety would likely have been corrected by the jury instruction, and Crosgrove's claim of prosecutorial misconduct fails.

## VI. Sentencing Claims

Crosgrove raised several objections to his presentence report and renews these objections on appeal. As discussed below, the objections are without merit.

### A. *Calculation of Amount of Loss*

Crosgrove objects to the method used in calculating the amount of loss attributable to him. The PSR stated that the appropriate loss figure for sentencing purposes was $2,896,432.00. Because this figure was in excess of $2,500,000 and below

$7,000,000, Crosgrove's base offense level was increased by 18 pursuant to U.S.S.G. § 2B1.1(b)(1)(J). The loss figure was based on fees paid by AREA/Noble members during Crosgrove's involvement with the fraud scheme, but Crosgrove argues that the correct loss amount is the value of improperly rejected claims. However, the total value of premiums paid is an appropriate measure of loss in a fraudulent insurance case.

This conclusion is supported by *United States v. Sanders*, 95 F.3d 449, 454 (6th Cir. 1996). In *Sanders*, a defendant convicted for his involvement with a fraudulent insurance scheme argued that the district court had committed error by basing the loss amount for sentencing on premiums collected by the entire conspiracy rather than just the amount he was ordered to pay in restitution to the victims, which he argued constituted the actual loss caused by the fraud. We determined that because victims in a fraudulent insurance scheme "are not left with any collateral to sell," it is inappropriate to analogize such schemes to secured loan fraud cases in calculating the loss amount. *Id.* at 455. In cases of unsecured fraud, the district court may look at all money collected to determine the appropriate loss amount. *Id.*

Crosgrove distinguishes his case from *Sanders* by arguing that *Sanders* involved a fraudulent insurance company, while AREA/Noble was a professional membership organization that offered fraudulent insurance as one of its "benefits." Crosgrove does not provide any basis for his position that a fraudulent company that claims only to provide insurance should be distinguished from a membership organization that markets itself almost exclusively in terms of the fraudulent insurance coverage it claims to provide. At best, this argument might support Crosgrove's position that the value of other member benefits should be deducted from the fees paid, but it certainly does not explain why rejected claims rather than fees taken in should have been used to calculate loss amounts. Because Crosgrove's distinctions fail, *Sanders* is controlling, and this claim of error is without merit.

Crosgrove further argues that AREA/Noble provided its members with benefits other than insurance coverage, and that the value of these benefits should have been subtracted from the base loss amount, however calculated. These benefits included a

newsletter, gifts for clients, and a referral service.  Crosgrove did not suggest an appropriate value for these incidentals below or on appeal.  Regardless, even where legitimate services are provided in connection with a fraud, the district court may refuse to consider the value of those services in determining the appropriate amount of loss.  *See United States v. Triana*, 468 F.3d 308, 320-321 (6th Cir. 2006).  In *Triana*, a podiatrist who had been banned from collecting Medicare payments set up an elaborate network of companies through which licensed podiatrists provided needed foot care to nursing-home residents.  These companies had received $1,764,199.36 from Medicare, which the district court determined to be the appropriate amount of loss.  Triana argued that no actual loss had occurred because all of the billings were for legitimate podiatry services that had been provided to qualifying Medicare recipients.  *Id.* at 320.  The district court determined that Triana's argument missed the point, because "the evidence showed that Medicare would not have paid [Triana's company] but for the fraud." *Id.* (internal quotations omitted).  This court affirmed the district court's determination.

Like Triana, Crosgrove argues that the value of legitimate services provided in fraudulent schemes should be used to offset the loss amount. The incidental membership benefits identified by Crosgrove are of far more questionable value than the medical services rendered in *Triana*.  For that reason alone there is no basis for departing from the total-funds-collected method adopted in *Sanders* and *Triana*.  *Triana* could be distinguished in that it involved a separation between beneficiaries and victims: the Medicare patients received the legitimate services while the Government was the paying party.  In the instant case, the same parties who paid membership fees received the benefits identified by Crosgrove.  Nonetheless, the logic that Medicare would not have paid but for the fraud in *Triana* can also apply where beneficiaries and victims are one and the same.  Crosgrove has not argued, and could not credibly contend, that AREA/Noble members would have paid the groups' membership fees only to receive newsletters and client gifts.  Multiple AREA/Noble employees testified that the companies marketed themselves as providing realtors and appraisers with errors-and-omissions coverage.  The organizations gained members by marketing insurance coverage, and it is impossible to believe that members would have paid anything had

they known the coverage was fraudulent.  Therefore, *Triana* applies in spite of this distinction between the cases, and the district court did not commit error in refusing to subtract the unspecified value of other member benefits when determining the final loss amount.

Crosgrove also argues that "[b]ecause the jury made no finding regarding the amount of loss . . . the trial court should have sentenced him based upon the lowest available base offense level without enhancements."  Crosgrove supports this claim by citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000), without explanation.  However, this court has repeatedly held that a district court can make factual findings as to the amount of loss in calculating a sentence. *See, e.g., United States v. Gross*, 626 F.3d 289, 299 (6th Cir. 2010); *United States v. Osborne*, 545 F.3d 440, 445 (6th Cir. 2008). Therefore, Crosgrove's argument that the district court committed error in applying an amount-of-loss enhancement without a jury finding is without merit.

Crosgrove's final amount-of-loss argument is that the loss attributed to him was not reasonably foreseeable to him, because the bulk of the fees received during his employment were deposited into Chicago accounts to which Crosgrove never had access.  The fact that Crosgrove could not reach the money, however, does not mean he didn't know it was coming in.  There was testimony that the Chicago "office" was simply a mailbox to which some members sent fees.  Those fees were then deposited in the Chicago account, and applications and transaction logs would then be forwarded directly to the Ohio office in which Crosgrove worked.  Because Crosgrove sent out membership acknowledgments with the fraudulent insurance policies, he would undoubtedly have a sense of the magnitude of the conspiracy based on the transaction logs and the size of the mailing lists.  Therefore, his role in the conspiracy was not sufficiently compartmentalized to support his argument that he could not foresee the full extent of the loss.

*B. Sophisticated-Means Enhancement*

Crosgrove received a two-level increase under U.S.S.G. § 2B1.1(b)(9) for the use of sophisticated means in committing the crime. The application notes to § 2B1.1(b)(9) identify "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts" as conduct that ordinarily indicates sophisticated means. Although Crosgrove acknowledges that off-shore companies and shells were involved in this conspiracy, he argues that he should not have received a sophisticated-means enhancement because he was not involved with the creation of any shell companies or with off-shore activities. This argument misunderstands the guidelines definition of relevant conduct. Guidelines § 1B1.3(a)(1)(B) defines relevant conduct for jointly undertaken criminal activity as "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." Therefore, a sophisticated-means enhancement could be applied to Crosgrove even if his role in the conspiracy did not involve the use of sophisticated means so long as the use of such means was reasonably foreseeable to him.

The sentencing court, however, concluded that Crosgrove himself had used sophisticated means, both by creating the John Thomas alias and by participating in the creation of false insurance certificates and other fraudulent correspondence. The court rooted its finding in the guidelines language and in case law dealing with sophisticated-means enhancements applied to crimes other than money laundering. These cases support the conclusion that the repeated use of fictitious identities can justify a sophisticated means enhancement, particularly when the identity is reinforced through other deceptive practices, such as instructing employees in handling calls directed to the fictitious party. *See United States v. Kopietz*, 126 F. App'x 708, 710-11 (6th Cir. 2005) (finding no clear error in district court's application of sophisticated-means enhancement to defendant who had aided in filing fifteen tax returns under fraudulent identities); *United States v. Lewis*, 76 F. App'x 47, 48 (6th Cir. 2003) (finding sophisticated-means enhancement appropriate for defendant who fraudulently obtained merchandise through

the use of an alias, fictitious companies, and fictitious references provided by his own employees).

Crosgrove's argument that he did not participate in the creation of shells or otherwise participate in offshore activities is therefore irrelevant unless he can also refute the finding that the use of a pseudonym and the issuance of fraudulent insurance certificates is not an appropriate basis for a sophisticated-means enhancement. Crosgrove makes no such argument, but instead focuses on the things he did not do during the conspiracy. But even this argument fails, as trial evidence showed that Crosgrove knew Midwest was an offshore company and repeatedly represented himself as Midwest's general counsel. Therefore, while he did not assist in the creation of Midwest, his role in the conspiracy was certainly not isolated from the use of offshore entities, and the district court did not commit error in applying a sophisticated-means enhancement.

## C. Special-Skills Enhancement

Crosgrove argues that his role in the conspiracy was only that of a salaried claims adjuster, and that he did not use his skills as a lawyer as part of the fraud. The district court properly rejected Crosgrove's arguments and concluded that a special-skills enhancement was appropriate under U.S.S.G. § 3B1.3, the notes to which specifically identify lawyers as possessing special skills for guidelines purposes. The district court concluded that Crosgrove's use of his title and his degree did play a role in the case. In particular, Crosgrove had repeatedly held himself out as general counsel for Midwest Insurance, giving some members' attorneys the impression that they were dealing with a high-ranking attorney and that their claims would therefore be handled properly. Therefore, the application of the special-skills enhancement does not constitute error.

## D. Sentencing Disparities Between Defendants

Crosgrove summarily argues in his reply brief that he was unjustifiably sentenced to a longer prison term than Haukedahl. Putting aside the fact that this argument was raised only perfunctorily in reply, this claim is mooted by the vacatur of Crosgrove's

conviction for conspiracy to commit money laundering. Because the statutory maximum for conspiracy to commit mail/wire fraud is substantially lower than the prison term Haukedahl received, it is unnecessary to examine Crosgrove's sentencing disparity claim.

## VII.  Conclusion

Crosgrove's conviction for conspiracy to commit mail/wire fraud is affirmed, while his conviction for conspiracy to commit money laundering is vacated.  All of Crosgrove's remaining claims of error are without merit, premature, or forfeited, and do not provide grounds for appellate relief.  The case is remanded for resentencing consistent with this opinion.