*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 12a0262p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

No. 09-6497

MELVIN SKINNER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
Nos. 06-00100-001; 07-00089-005—Thomas W. Phillips, District Judge.

Argued: January 19, 2012

Decided and Filed: August 14, 2012

Before: CLAY, ROGERS, and DONALD, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Gerald L. Gulley, Jr., GULLEY OLDHAM, PLLC, Knoxville, Tennessee, for Appellant. David P. Lewen, Jr., UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Gerald L. Gulley, Jr., GULLEY OLDHAM, PLLC, Knoxville, Tennessee, for Appellant. David P. Lewen, Jr., UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, Mark Eckenwiler, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

ROGERS, J., delivered the opinion of the court, in which CLAY, J., joined. DONALD, J. (pp. 17–23), delivered a separate opinion concurring in part and concurring in the judgment.

1

————————————

## OPINION

————————————

ROGERS, Circuit Judge.  When criminals use modern technological devices to carry out criminal acts and to reduce the possibility of detection, they can hardly complain when the police take advantage of the inherent characteristics of those very devices to catch them. This is not a case in which the government secretly placed a tracking device in someone's car.  The drug runners in this case used pay-as-you-go (and thus presumably more difficult to trace) cell phones to communicate during the cross-country shipment of drugs.  Unfortunately for the drug runners, the phones were trackable in a way they may not have suspected.  The Constitution, however, does not protect their erroneous expectations regarding the undetectability of their modern tools.

The government used data emanating from Melvin Skinner's pay-as-you-go cell phone to determine its real-time location.  This information was used to establish Skinner's location as he transported drugs along public thoroughfares between Arizona and Tennessee.  As a result of tracking the cell phone, DEA agents located Skinner and his son at a rest stop near Abilene, Texas, with a motorhome filled with over 1,100 pounds of marijuana. The district court denied Skinner's motion to suppress all evidence obtained as a result of the search of his vehicle, and Skinner was later convicted of two counts related to drug trafficking and one count of conspiracy to commit money laundering.  The convictions must be upheld as there was no Fourth Amendment violation, and Skinner's other arguments on appeal lack merit.  In short, Skinner did not have a reasonable expectation of privacy in the data emanating from his cell phone that showed its location.

## I.

Melvin Skinner was convicted by a jury on two counts related to drug trafficking and one count of conspiracy to commit money laundering in connection with his role as a courier in a large-scale drug-trafficking operation led by James Michael West.

The events leading up to Skinner's arrest and conviction began in January 2006, when Christopher S. Shearer, a participant in West's marijuana-trafficking conspiracy, was stopped in Flagstaff, Arizona with $362,000. Police stopped Shearer on his way to deliver money to West's marijuana supplier, Philip Apodaca, who lived in Tucson, Arizona.

Drug Enforcement Administration ("DEA") authorities learned from Shearer how West operated his drug conspiracy. Between 2001 and 2006, Apodaca would send marijuana that he obtained from Mexico to West in Tennessee via couriers. Apodaca purchased pay-as-you-go cell phones that he programmed with contact information and then gave to the couriers to maintain communication. When buying the phones, Apodaca provided false names and addresses for the phone subscriber information. After some time, West and his affiliates would discard their pay-as-you-go phones and get new ones with different telephone numbers and fictitious names. Apodaca was unaware that these phones were equipped with GPS technology.

In May and June 2006, authorities obtained orders authorizing the interception of wire communications from two phones that were not pay-as-you-go, but rather phones subscribed in West's name. Through these calls between West and Shearer, agents learned that West used as a courier an over-the-road truck driver referred to as "Big Foot" (later identified as the defendant in this case, Melvin Skinner). From Shearer and the phone calls, agents determined that, on many occasions beginning in 2001, Big Foot delivered money to Apodaca in Arizona and then returned to Tennessee with hundreds of pounds of marijuana for West. Big Foot's courier activities temporarily ceased between 2002–2004, but thereafter he resumed transporting drugs and money for West. In late 2005, West advanced Big Foot money to purchase a pickup truck for transporting drugs.

In June 2006, authorities determined that West was using one secret phone to communicate with Apodaca and a second secret phone to communicate with Big Foot. Authorities thought that Big Foot was using a phone with the number (520) 869-6447 ("6447 phone").

Based on calls intercepted in late June and early July 2006, authorities learned that Big Foot had recently delivered between $150,000 and $300,000 to Apodaca to pay off existing drug debt and purchase additional drugs. In later calls between West and Apodaca, the agents also determined that Big Foot would meet Apodaca in Tucson, Arizona on July 11, 2006, to pick up approximately 900 pounds of marijuana. Big Foot would be driving a "nice [RV] with a diesel engine," while Big Foot's son would be driving an F-250 pickup truck, both with Southern license plates. Big Foot would then leave for West's home in Mooresburg, Tennessee, on or about Thursday, July 13, 2006. Believing that Big Foot was carrying the 6447 phone, authorities obtained an order from a federal magistrate judge on July 12, 2006, authorizing the phone company to release subscriber information, cell site information, GPS real-time location, and "ping" data for the 6447 phone in order to learn Big Foot's location while he was en route to deliver the drugs.

That same day, agents "pinged" the 6447 phone and discovered that it was currently located in Candler, North Carolina, the location of West's primary residence. Based upon intercepted calls as well as the 6447 phone's records, agents determined that West was using the 6447 phone to communicate with Big Foot on a phone with a (520) 869-6820 number ("6820 phone"). Authorities then obtained a second order from the magistrate judge authorizing release of the same information for the 6820 phone, which revealed that the phone was located near Flagstaff, Arizona.

By continuously "pinging" the 6820 phone, authorities learned that Big Foot left Tucson, Arizona on Friday, July 14, 2006, and was traveling on Interstate 40 across Texas. At no point did agents follow the vehicle or conduct any type of visual surveillance. At around 2:00 a.m. on Sunday, July 16, 2006, the GPS indicated that the 6820 phone had stopped somewhere near Abilene, Texas. Authorities coordinated with agents in the Lubbock, Texas office of the DEA, who were quickly dispatched to a truck stop. At the truck stop, agents discovered a motorhome and a truck with Georgia license plates. An officer approached the motorhome, knocked on the door, and introduced himself to the man, later identified as Skinner, who answered the door. After Skinner

denied the officer's request to search the vehicle, a K-9 officer and his dog who were at the scene conducted a perimeter dog sniff around the motorhome that alerted officers to the presence of narcotics. The officers then entered the motorhome, where they discovered sixty-one bales of marijuana, over 1,100 pounds, as well as two cellular phones and two semi-automatic handguns. Skinner and his son, Samuel, were placed under arrest.

Skinner was charged with conspiracy to distribute and possess with intent to distribute in excess of 1,000 kilograms of marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A), conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and aiding and abetting the attempt to distribute in excess of 100 kilograms of marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B), and 18 U.S.C. § 2.

Prior to trial, Skinner sought to suppress the search of the motorhome, alleging that the agents' use of GPS location information emitted from his cell phone was a warrantless search that violated the Fourth Amendment. After an evidentiary hearing, the magistrate judge determined that, "[b]ased on the thrust of Fourth Amendment precedent and the facts of this case," Skinner lacked standing to assert a Fourth Amendment protected interest because the cell phone was not subscribed to him and was used as part of a criminal scheme. The magistrate judge further opined that because the cell phone was utilized on public thoroughfares and was "bought by a drug supplier and provided to . . . Skinner as part and parcel of his drug trafficking enterprise," Skinner did not have a legitimate expectation of privacy in the phone or in the motorhome that was driven on public roads. In addition, the magistrate judge determined that, "even if the search was found unconstitutional, the good faith exception would apply." The district court fully adopted the magistrate judge's Report and Recommendation, and denied Skinner's motion to suppress.

Skinner's case proceeded to a ten-day trial, and the jury found Skinner guilty on all counts. Skinner moved for a judgment of acquittal, or in the alternative a new trial, and the district court denied the motion.

At sentencing, the district court heard testimony regarding the drug conspiracy and Skinner's role in it. In calculating Skinner's base offense level, the presentence report had included only the amounts of marijuana personally attributed to Skinner. Skinner argued, however, that due to his minimal role in the conspiracy he should receive a mitigating role adjustment under U.S.S.G. § 3B1.2. The district court determined that no mitigating role reduction was warranted because Skinner "facilitated the transportation of vast amounts of marijuana and money back and forth across the country" and "[t]he conspiracy would not have been successful without the participation of the drivers." Therefore, because Skinner "facilitated and allowed this conspiracy to progress," the district court found that he was "more than just a minor or minimum player."

Skinner was sentenced to 235 months' imprisonment as to each of Counts One, Two, and Three, with the terms to run concurrently. This term of imprisonment was at the low end of the advisory guideline range of 235–239 months.

Skinner now appeals, arguing that the use of the GPS location information emitted from his cell phone was a warrantless search that violated the Fourth Amendment, that there was insufficient evidence to find him guilty of conspiracy to commit money laundering, and that as a minor participant in the drug conspiracy he was entitled to a mitigating role reduction.

## II.

### A. No Fourth Amendment Violation

There is no Fourth Amendment violation because Skinner did not have a reasonable expectation of privacy in the data given off by his voluntarily procured pay-as-you-go cell phone. If a tool used to transport contraband gives off a signal that can be tracked for location, certainly the police can track the signal. The law cannot be that

a criminal is entitled to rely on the expected untrackability of his tools.[1] Otherwise, dogs could not be used to track a fugitive if the fugitive did not know that the dog hounds had his scent. A getaway car could not be identified and followed based on the license plate number if the driver reasonably thought he had gotten away unseen. The recent nature of cell phone location technology does not change this. If it did, then technology would help criminals but not the police. It follows that Skinner had no expectation of privacy in the context of this case, just as the driver of a getaway car has no expectation of privacy in the particular combination of colors of the car's paint.

This conclusion is directly supported by *United States v. Knotts*, 460 U.S. 276 (1983). In *Knotts*, the police, with the consent of a chemical company, placed a beeper in a five-gallon drum of chloroform in order to track the movements of a defendant and discover the location of a clandestine drug laboratory. Using visual surveillance, as well as the signal emitted from the beeper when police lost visual contact, law enforcement officials traced the car to a secluded cabin, where the defendant and others had been manufacturing illicit drugs. The Supreme Court held that this monitoring did not violate the Constitution because "[t]he governmental surveillance conducted by means of the beeper in this case amounted principally to the following of an automobile on public streets and highways. . . . A person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Id.* at 281. The Court noted that, in Knott's case, "[a] police car following [a defendant] at a distance throughout his journey could have observed him leaving the public highway and arriving at the cabin . . . . [T]here is no indication that the beeper was used in any way to reveal information . . . that would not have been visible to the naked eye." *Id.* at 285. Similar to the circumstances in *Knotts*, Skinner was traveling on a public road before he stopped at a public rest stop. While the cell site information aided the police in determining Skinner's location, that same information could have been obtained through visual surveillance.

---

[1]We do not mean to suggest that there was no reasonable expectation of privacy *because* Skinner's phone was used in the commission of a crime, or that the cell phone was illegally possessed. On the contrary, an innocent actor would similarly lack a reasonable expectation of privacy in the inherent external locatability of a tool that he or she bought.

There is no inherent constitutional difference between trailing a defendant and tracking him via such technology. Law enforcement tactics must be allowed to advance with technological changes, in order to prevent criminals from circumventing the justice system. The Supreme Court said as much in *Knotts*, noting that, "[i]nsofar as respondent's complaint appears to be simply that scientific devices such as the beeper enabled the police to be more effective in detecting crime, it simply has no constitutional foundation. We have never equated police efficiency with unconstitutionality, and we decline to do so now." *Id.* at 284. In drawing this conclusion, the Court discussed *Smith v. Maryland*, 442 U.S. 735, 744–45 (1979), where a defendant was found to have no reasonable expectation of privacy in the numbers he dialed on his phone, even after that information was automated by the phone company. The Court compared this technology to giving the numbers to a telephone operator, where they would not be confidential: "We are not inclined to hold that a different constitutional result is required because the telephone company has decided to automate." *Knotts*, 460 U.S. at 283. Similar reasoning compels the conclusion here that Skinner did not have a reasonable expectation of privacy in the location of his cell phone while traveling on public thoroughfares.

Skinner's case also falls squarely within this court's precedent in *United States v. Forest*, 355 F.3d 942 (6th Cir. 2004). In *Forest*, DEA agents had lost visual contact of the defendant as he traveled on public roads to meet two suspected drug couriers. To reestablish contact, agents called the defendant's cell phone, hanging up before it rang, in order to "ping" or gather data on the phone's physical location. Using this information, agents were able to determine the defendant's movements along a public roadway, and ultimately to arrest the defendant at a gas station the following day. We held that such monitoring did not violate the Fourth Amendment because, as in *Knotts*, "the DEA agents could have obtained the same information by following [the defendant's] car." *Id.* at 951. "Although the DEA agents were not able to maintain visual contact with [the defendant's] car at all times, visual observation was *possible* by any member of the public. The DEA agents simply used the cell-site data to 'augment[

] the sensory faculties bestowed upon them at birth,' which is permissible under *Knotts*." *Id.* (quoting *Knotts*, 460 U.S. at 282).  The same is true in Skinner's case.

In *Forest*, we also rejected the argument that even if a defendant does not have a legitimate expectation of privacy regarding his location, he does have a legitimate expectation of privacy in the cell site data itself.  *Forest*, 355 F.3d at 951–52.  Because "the cell-site data is simply a proxy for [the defendant's] visually observable location," and a defendant has "no legitimate expectation of privacy in his movements along public highways," we concluded, as we do here, that "the Supreme Court's decision in *Knotts* is controlling, and [thus] the DEA agents did not conduct a search within the meaning of the Fourth Amendment."  *Id.*

Skinner counters that, unlike *Knotts* and *Forest*, the DEA agents in his case had never established visual surveillance of his movements, did not know his identity, and did not know the make or model of the vehicle he was driving (although they did know it was a motorhome that was accompanied by a pickup truck).  Skinner argues that, in this instance, technology was used to supplement, not "augment," the "sensory faculties" of the agents.  But even if the agents in *Knotts* and *Forest* momentarily had visual contact of the defendant, and then relied on technology either to reestablish contact or to learn where to initiate visual observation, this was not critical to our analysis. Therefore, no real distinction exists in Skinner's case.  In all three instances the defendant's movements could have been observed by any member of the public, a crucial fact for this court in *Forest*.  As for not knowing his identity, this is irrelevant because the agents knew the identity of Skinner's co-conspirators and could have simply monitored their whereabouts to discover Skinner's identity.  Using a more efficient means of discovering this information does not amount to a Fourth Amendment violation.  In any event, we determine whether a defendant's reasonable expectation of privacy has been violated by looking at what the defendant is disclosing to the public, and not what information is known to the police.

Although not necessary to find that there was no Fourth Amendment violation in this case, the Government's argument is strengthened by the fact that the authorities

sought court orders to obtain information on Skinner's location from the GPS capabilities of his cell phone. The government received authorization from the magistrate judge to receive location information from the cell phone company so that agents could locate and track Skinner's vehicle that was carrying the load of marijuana. When the first cell phone number turned out to be with West in North Carolina, authorities then sought and obtained a second order from the magistrate judge to "ping" the second cell phone number and locate the drugs while they were still en route.

This case is different from the recent Supreme Court decision in *United States v. Jones*, 132 S. Ct. 945 (2012). That case involved the secret placement of a tracking device on the defendant's car, *id.* at 948, and the Court's opinion explicitly relied on the trespassory nature of the police action. *Id.* at 949. Although Fourth Amendment jurisprudence includes an assessment of the defendant's reasonable expectation of privacy, that "d[oes] not erode the principle 'that, when the Government *does* engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment.'" *Id.* at 951 (quoting *Knotts*, 460 U.S. at 286 (Brennan, J., concurring)). No such physical intrusion occurred in Skinner's case. Skinner himself obtained the cell phone for the purpose of communication, and that phone included the GPS technology used to track the phone's whereabouts. The majority in *Jones* based its decision on the fact that the police had to "physically occup[y] private property for the purpose of obtaining information." 132 S. Ct. at 949. That did not occur in this case. Indeed, the *Jones* opinion explicitly distinguished *Knotts* on this ground—that trespass was not an issue in *Knotts*—and in no way purported to limit or overrule the Court's earlier holding in *Knotts*. *Id.* at 951–52. Moreover, *Jones* does not apply to Skinner's case because, as Justice Sotomayor stated in her concurrence, "the majority opinion's trespassory test" provides little guidance on "cases of electronic or other novel modes of surveillance that do not depend upon a physical invasion on property." *Id.* at 955 (Sotomayor, J., concurring).

Skinner's case also does not present the concern raised by Justice Alito's concurrence in *Jones*, 132 S. Ct. at 95–64. There may be situations where police, using

otherwise legal methods, so comprehensively track a person's activities that the very comprehensiveness of the tracking is unreasonable for Fourth Amendment purposes. As Justice Alito recognized, prior to certain advances in technology, "practical" considerations often offered "the greatest protections of privacy." *Id.* at 963. For instance, in the situation presented in *Jones*, "constant monitoring of the location of a vehicle for four weeks . . . would have required a large team of agents, multiple vehicles, and perhaps aerial assistance." *Id.* Technology, however, has made it possible to conduct a level of extreme comprehensive tracking, "secretly monitor[ing] and catalogu[ing] every single movement" that the defendant made over four weeks, that previously would have been impossible. *Id*. at 964.

No such extreme comprehensive tracking is present in this case. Justice Alito's concurrence and the majority in *Jones* both recognized that there is little precedent for what constitutes a level of comprehensive tracking that would violate the Fourth Amendment. *Id.* at 954, 964. Skinner's case, however, comes nowhere near that line. While *Jones* involved intensive monitoring over a 28-day period, here the DEA agents only tracked Skinner's cell phone for three days. Such "relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable." *Id.* at 964 (Alito, J., concurring) (citing *Knotts*, 460 U.S. at 281–82). Here, the monitoring of the location of the contraband-carrying vehicle as it crossed the country is no more of a comprehensively invasive search than if instead the car was identified in Arizona and then tracked visually and the search handed off from one local authority to another as the vehicles progressed. That the officers were able to use less expensive and more efficient means to track the vehicles is only to their credit.

The Supreme Court in *Jones* also distinguished its previous holding in *United States v. Karo*, 468 U.S. 705 (1984), that the installation of a beeper in a container did not constitute a search or seizure, as follows:

> The Government, we said [in *Karo*], came into physical contact with the container only before it belonged to the defendant Karo; and the transfer of the container with the unmonitored beeper inside did not convey any

> information and thus did not invade Karo's privacy.  That conclusion is
> perfectly consistent with the one we reach here.  Karo accepted the
> container as it came to him, beeper and all, and was therefore not entitled
> to object to the beeper's presence, even though it was used to monitor the
> container's location.

*Jones*, 132 S.Ct. at 952 (internal citation omitted).  The same distinction applies even more strongly here: the Government never had physical contact with Skinner's cell phone; he obtained it, GPS technology and all, and could not object to its presence.

Because authorities tracked a known number that was voluntarily used while traveling on public thoroughfares, Skinner did not have a reasonable expectation of privacy in the GPS data and location of his cell phone.  Therefore, suppression is not warranted and the district court correctly denied Skinner's motion to suppress.

**B.  Sufficiency of the Evidence for Conspiracy to Commit Money Laundering**

There was sufficient evidence for a reasonable trier of fact to convict Skinner of conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(h). Section 1956(a)(1)(A)(i) provides for criminal penalties against any person who, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity."  In this case, Skinner knowingly and routinely transported drug receipts to Arizona so that he could pay off prior debts related to the drug-trafficking conspiracy, and obtain additional marijuana in furtherance of the conspiracy.  In considering Skinner's insufficiency of the evidence claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  The record clearly supports the jury's verdict that Skinner was guilty of conspiracy to commit money laundering.

Skinner argues that the drug receipts he transported were not "profits" and therefore were not "proceeds" under the money laundering statute. He relies on the definition of "proceeds" as "profits" discussed in *United States v. Santos*, 553 U.S. 507 (2008). In *Santos*, the Supreme Court held that a money-laundering conviction of a man involved in an illegal gambling operation was improper because, based on the facts of that case and relying on the rule of lenity, "proceeds" under § 1956(a)(1) meant "profits" and not "receipts." *Id.* at 514.

But as we explained in *United States v. Crosgrove*, 637 F.3d 646 (6th Cir. 2011), "proceeds" means "profits" only where the "predicate offense creates a merger problem that leads to a radical increase in the statutory maximum sentence and . . . nothing in the legislative history suggests that Congress intended such an increase." *Id.* at 654–55 (quoting *United States v. Kratt*, 579 F.3d 558, 562 (6th Cir. 2009)). In other cases, "proceeds" can still include gross receipts. *Crosgrove*, 637 F.3d at 654. We so held in a case involving receipts from bank fraud in *United States v. Kratt*, 579 F.3d 558 (6th Cir. 2009). As Skinner's case does not present a merger problem, the gross receipts in Skinner's case are proceeds, and there was sufficient evidence to convict Skinner of conspiracy to commit money laundering.

Skinner's case does not present a merger problem. "Under the *Santos-Kratt* framework, a merger problem arises when defining 'proceeds' as 'receipts' automatically makes commission of the predicate offense a commission of money laundering and where the predicate offense carries a much lower statutory maximum sentence than the associated money laundering charge." *Crosgrove*, 637 F.3d at 655 (citing *Kratt*, 579 F.3d at 563). In this case, Skinner was indicted, tried, and convicted on three charges: Conspiracy to Distribute and Possess with Intent to Distribute 1,000 Kilograms or More of Marijuana ("Count I"); Conspiracy to Commit Money Laundering ("Count II"); and Aiding and Abetting in the Attempt to Distribute in Excess of 100 Kilograms of Marijuana ("Count III"). Regardless of which drug charge is considered the "predicate offense" for the purposes of Skinner's merger argument under *Santos*, both carry heavier maximum penalties under their corresponding statutes than does the

money laundering charge.  Count I, the drug conspiracy charge, is a Class A Felony carrying a mandatory minimum of 10 years to life imprisonment.  Count III, the aiding and abetting drug charge, is a Class B Felony carrying a mandatory minimum of 5 years' up to 40 years' imprisonment.  The money laundering charge listed in Count II is a Class C Felony with a statutory maximum sentence of 20 years, and for this charge there is no mandatory minimum.  Skinner therefore cannot rely on *Santos* because, under *Kratt* and *Cosgrove*, conviction of the money laundering charge did not result in a radical increase in his statutory maximum sentence.

In any event, we have already held in the drug-trafficking context that "proceeds" are not limited to "profits."  In *United States v. Smith*, 601 F.3d 530 (6th Cir. 2010), we explained that Justice Stevens, who was the necessary fifth vote in *Santos*, made it clear in his concurring opinion that "the predicate offense of conspiracy to distribute cocaine does not fall within the category of offenses for which 'proceeds' means 'profits.'" *Id.* at 544 (citing *Santos*, 553 U.S. at 526 n.3).  In refusing to hold that "proceeds" under the money-laundering statute must always mean "profits," Justice Stevens "stated specifically that 'the legislative history of § 1956 makes it clear that Congress intended the term 'proceeds' to include gross revenues from the sale of contraband and the operation of organized criminal syndicates involving such sales,' and he stated that he did not agree with the plurality that 'the rule of lenity must apply to the definition of 'proceeds' for these types of unlawful activities.'" *Smith*, 601 F.3d at 544 (citing *Santos*, 553 U.S. at 525–26 n.3).  Therefore, "[a] majority of the Court (Justice Stevens plus the dissenting Justices) explicitly preserved the possibility that 'proceeds' does not necessarily mean 'profits' when a member of a drug conspiracy is prosecuted under § 1956." *Smith*, 601 F.3d at 544.

Viewing the evidence in the light most favorable to the prosecution, and interpreting "proceeds" to include "gross receipts," as dictated by our precedent, there was sufficient evidence for a rational trier of fact to convict Skinner of conspiracy to commit money laundering.  Skinner knowingly and routinely transported drug proceeds in furtherance of the drug-trafficking conspiracy, and he was aware that he was paying

Apodaca with West's drug money in order to obtain more drugs to transport to Tennessee.

## C.  No Mitigating Role Reduction

At sentencing, the district court did not err in denying a mitigating role reduction under U.S.S.G. § 3B1.2, because Skinner's role as courier was critical to the success of the drug trafficking and money laundering conspiracies.  To receive a reduction, Skinner was required to "prov[e] . . . by a preponderance of the evidence . . . that he played a relatively minor role in conduct for which he was held accountable," *United States v. Sheafe*, 69 F. App'x 268, 270 (6th Cir. 2003).  *See also United States v. Groenendal*, 557 F.3d 419, 427–28 (6th Cir. 2009).  The district court did not err in denying the mitigating role adjustment, which authorizes a four-level reduction in offense level if the defendant is deemed a "minimal" participant in the criminal activity, a two-level reduction if he is deemed a "minor" participant, and a three-level reduction if he falls somewhere in between. *See* U.S.S.G. § 3B1.2.

The district court determined that Skinner was responsible for 12,611 pounds of marijuana, the amount he actually delivered or transported, not the total amount of drugs transported throughout the entire conspiracy.  Since November 1, 2001, the Sentencing Commission has said that a defendant is not *precluded* from being considered for a mitigating role reduction simply because he is held accountable only for the quantity of drugs attributable to him.  U.S.S.G. § 3B1.2 cmt. n.3(A).  However, while Skinner is eligible for a mitigating role reduction, this determination is left to the discretion of the district court, which in this instance did not clearly err in denying the reduction in light of Skinner's instrumental role in the conspiracies.

As a courier, Skinner's role in the conspiracy was critical to its success.  "[T]he critical question in whether to grant a 'mitigating role' reduction is what role the defendant played in relation to others involved in the criminal enterprise." *United States v. Henderson*, 307 F. App'x 970, 983 (6th Cir. 2009) (citing *United States v. Campbell*, 279 F.3d 392, 396 (6th Cir. 2002)).  At sentencing, the district court determined that Skinner "facilitated the transportation of vast amounts of marijuana and money back and

forth across the country," and "[t]he conspiracy would not have been successful without the participation of the drivers . . . . [T]his defendant facilitated and allowed this conspiracy to progress. . . . That is more than just a minor or minimum player." There is nothing in the record to suggest that these determinations were clearly erroneous, and they justify the district court's denial of the mitigating role adjustment. *See Campbell*, 279 F.3d at 396 (stating clearly erroneous standard for factual determinations).

Although Skinner argues that he should be granted the mitigating role reduction because he did not have a "high degree of culpability" in the conspiracy and because his role was largely limited to that of a courier or "mule," we affirmed the district court's denial of a mitigating role adjustment in a case factually similar to Skinner's. In *Sheafe*, the defendant was charged with several narcotics-related offenses due to his participation as the driver in three inter-state shipments of cocaine. 69 F. App'x at 269. We rejected Sheafe's "protestations that he was a lowly courier" and determined it to be "immaterial that Sheafe was not the owner of the cocaine or the leader or organizer of the drug transaction. A defendant does not qualify for a mitigating role reduction merely because someone else planned the scheme and made all the arrangements." *Id.* at 270 (citation omitted). Rather, we determined that a "defendant who plays a lesser role in a criminal scheme may nonetheless fail to qualify as a minor participant if his role was indispensable or critical to the success of the scheme, or if his importance in the overall scheme was such as to justify his sentence." *United States v. Salgado*, 250 F.3d 438, 458 (6th Cir. 2001) (citation omitted). As in Skinner's case, in Sheafe's case "the conspiracy could not have succeeded without someone to transport the [drugs]." *Sheafe*, 69 F. App'x at 270. The district court, therefore, could properly determine that Skinner played a critical role in the drug-trafficking and money-laundering conspiracies.

**III.**

The judgment of the district court is affirmed.

---

**CONCURRING IN PART AND CONCURRING IN THE JUDGMENT**

---

DONALD, J., concurring in part and concurring in the judgment.  I join Parts II.B and II.C of the majority opinion, which conclude that the evidence was sufficient to support Skinner's conviction for conspiracy to commit money laundering and that Skinner was not entitled to a mitigating-role reduction in sentencing.  As to Part II.A, I concur only in the judgment because I do not agree that Skinner lacked a reasonable expectation of privacy in the GPS data emitted from his cellular phone.  In my view, acquisition of this information constitutes a search within the meaning of the Fourth Amendment, and, consequently, the officers were required to either obtain a warrant supported by probable cause or establish the applicability of an exception to the warrant requirement.  However, because the officers had probable cause to effect the search in this case and because the purposes of the exclusionary rule would not be served by suppression, I believe some extension of the good faith exception enunciated in *United States v. Leon*, 468 U.S. 897 (1984), is appropriate.  Accordingly, I would also affirm the district court's denial of Skinner's motion to suppress, but for reasons other than those announced by the majority.

### A.  Reasonable expectation of privacy

In the context of the Fourth Amendment, standing turns on whether a person has a "constitutionally protected reasonable expectation of privacy." *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring).  The analysis of this constitutionally-protected interest involves a two-part inquiry:  "First, has the individual manifested a subjective expectation of privacy in the object of the challenged search?  Second, is society willing to recognize that expectation as reasonable?" *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)).

Though the majority does not discuss the first prong of this test, Skinner's use of the phone arguably manifests his subjective expectation of privacy in his GPS location

information. In fact, the majority aptly points out that the phone was trackable in a way that Skinner most likely did not anticipate. Skinner's erroneous belief that the phone was untrackable, or even his general ignorance of the phone's GPS capabilities, supports the conclusion that Skinner had a subjective expectation of privacy in this information.

The critical question, then, is whether society is prepared to recognize Skinner's expectation of privacy as legitimate. The majority implicitly answers this question in the negative, focusing on the criminal conduct in which Skinner was engaged and declaring that "[t]he law cannot be that a criminal is entitled to rely on the expected untrackability of his tools." This seems to suggest that, assuming Skinner has a subjective expectation of privacy in the cell phone, it is not one that society is prepared to recognize as legitimate because he used the phone in the commission of a crime. While this circuit's law is not well developed on this point, numerous courts have held that privacy expectations are not diminished by the criminality of a defendant's activities. *See, e.g.*, *United States v. Hicks*, 59 F. App'x 703, 706 (6th Cir. 2003) ("it is far from clear that the legitimacy of one's privacy expectation can be made to depend on the nature of his activities—innocent or criminal"); *United States v. Pitts*, 322 F.3d 449, 458 (7th Cir. 2003) ("We may not justify the search after the fact, once we know illegal activity was afoot; the legitimate expectation of privacy does not depend on the nature of the defendant's activities, whether innocent or criminal."); *United States v. Fields*, 113 F.3d 313, 321 (2d Cir. 1997) ("We also reject the government's argument that the illegal nature of Fields' activities made any expectation of privacy regarding the premises unreasonable."); *United States v. Taborda*, 635 F.2d 131, 139 n.10 (2d Cir. 1980) ("We disagree . . . that the amount of Fourth Amendment recognition accorded to a person's privacy expectations may vary solely on the basis of whether his activity is criminal or innocent."). To hold otherwise would ignore the fact that "many Fourth Amendment issues arise precisely because the defendants were engaged in illegal activity on the premises for which they claim privacy interests." *Fields*, 113 F.3d at 321.

On the other hand, it bears noting that courts have declined to recognize a "legitimate" expectation of privacy in contraband and other items the possession of

which are themselves illegal, such as drugs and stolen property.  In *United States v. Bailey*, we explained the important distinction, for Fourth Amendment purposes, between the electronic monitoring of contraband and non-contraband items, stating:

> [T]here is a clear line of demarcation between, on the one hand, contraband and other items, such as stolen goods, whose possession is illegal, and on the other, goods, whatever their suspected use, whose possession is legal. The narcotics peddler in whose heroin a beeper is planted has no privacy interest in the substance; but the same is not so of legally-possessed substances into which a beeper is placed, even if these are destined later to be used in the commission of a crime. . . .
>
> The rationale of the Government's argument would authorize warrantless beeper surveillance of laboratory equipment, handguns, or *any other legitimately owned item the Government suspected would be used to commit a crime*. The fourth amendment contains no such exception. If the Government reasonably suspects non-contraband items will be used for criminal purposes, presumably it can articulate sufficient grounds to convince a neutral magistrate to issue a warrant authorizing beeper surveillance of those items. For fourth amendment purposes, there is a clear distinction between contraband and other property.

628 F.2d 938, 944 (6th Cir. 1980) (emphasis added).  Although the majority states that pay-as-you-go phones are presumably more difficult to trace, perhaps implying that possession of such phones is somehow illicit or suspicious in itself, Skinner's phone was not contraband and his possession of the phone was not illegal.  Nevertheless, the majority holds that Skinner had no expectation of privacy in the data emitted from the phone because he was using the phone in the commission of a crime.  This is in direct conflict with the principle we articulated in *Bailey*.

In support of its conclusion, the majority relies on *United States v. Knotts*, wherein the Supreme Court found that the government's use of a beeper to track the whereabouts of a suspect "amounted principally to the following of an automobile on public streets and highways."   460 U.S. 276, 281 (1983).  According to the majority, there is no meaningful distinction between this case and *Knotts* because "[w]hile the cell site information aided the police in determining Skinner's location, that same information could have been procured through visual surveillance."  It is not accurate, however, to say that police in this case acquired only information that they could have

otherwise seen with the naked eye. While it is true that visual observation of Skinner was possible by any member of the public, the public would first have to know that it was Skinner they ought to observe. This case is thus distinguishable from both *Knotts* and *United States v. Forest*, 355 F.3d 942 (6ᵗʰ Cir. 2004), in which officers had already identified and undertaken visual surveillance of a particular suspect. Authorities' use of electronic surveillance in those cases was used to *aid* surveillance already initiated. In this case, police had not and could not establish visual contact with Skinner without utilizing electronic surveillance *because they had not yet identified the target of their search*. Authorities did not know the identity of their suspect, the specific make and model of the vehicle he would be driving, or the particular route by which he would be traveling. Moreover, officers could not have divined any of this information without the GPS data emitted from Skinner's phone; therefore, they cannot be said to have merely "augmented the sensory faculties bestowed upon them at birth." *Knotts*, 460 U.S. at 282.

I would not characterize the question before us as whether society is prepared to recognize a legitimate expectation of privacy in the GPS data emitted from a cell phone used to effectuate drug trafficking. Rather, in keeping with the principle that the law affords the same constitutional protections to criminals and law-abiding citizens alike, the question is simply whether society is prepared to recognize a legitimate expectation of privacy in the GPS data emitted from any cell phone. Because I would answer this question in the affirmative, I cannot join Part II.A of the majority opinion.

**B. Good faith exception**

While I believe that authorities were required to get a warrant before effecting the search in this case, I nevertheless agree that Skinner's motion to suppress was properly denied. Therefore, I agree with the majority's conclusion that the district court should be affirmed.

In *United States v. Leon*, the Supreme Court noted that the Fourth Amendment does not itself proscribe the introduction of illegally seized evidence in all proceedings or against all defendants. 468 U.S. at 906. Rather, the "wrong condemned by the Amendment is 'fully accomplished' by the unlawful search or seizure itself," and the

"use of fruits of a past unlawful search or seizure 'work[s] no new Fourth Amendment wrong.'" *Id.* The issue before the Court in *Leon* was whether the sanction of exclusion is appropriate where officers act in reasonable reliance on a search warrant later found to be defective. *Id.* at 900. In considering the question, the Court weighed "the costs and benefits of preventing the use . . . of inherently trustworthy tangible evidence obtained in reliance on a search warrant issued by a detached and neutral magistrate that ultimately is found to be defective." *Id.* at 907. The Court recognized that an "unbending application" of the exclusionary rule "would impede unacceptably the truth-finding functions of judge and jury." *Id.* Moreover, where officers acted in objective good faith, application of the rule would not serve its remedial objectives. *Id.* at 907-08. The purpose of the exclusionary rule, after all, is to "deter police misconduct rather than to punish the errors of judges and magistrates." *Id.* at 916. Thus, an assessment of the flagrancy of the police misconduct, if any, is an important step in determining whether the "deterrent effect of the exclusionary rule" would be served under the facts of a particular case. *Id.* at 911.

There are some circumstances in which the good faith exception to the exclusionary rule does not apply. For instance:

> 1) when the warrant is issued on the basis of an affidavit that the affiant knows (or is reckless in not knowing) contains false information; 2) when the issuing magistrate abandons his neutral and detached role and serves as a rubber stamp for police activities; 3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; and 4) when the warrant is so facially deficient that it cannot be reasonably presumed to be valid.

*United States v. Thomas*, 605 F.3d 300, 311 (6th Cir. 2011).

As *Leon* and its progeny make clear, the applicability of the exclusionary rule in a particular case often depends upon the presence of deliberate police misconduct. In the present case, officers should have obtained a warrant authorizing them to collect GPS real-time location information for the 6820 phone; instead, they applied for and were issued an order. But this error does not necessarily mean that application of the exclusionary rule is warranted. The good faith exception enunciated in *Leon*, though not

expressly applicable to the kinds of orders at issue in the present case, could be extended if the purposes of the exclusionary rule would not be served by its application. Because there is no indication of police misconduct and officers clearly had probable cause, if not a warrant, to conduct the challenged search, I would affirm on this ground.

According to the Government's Response, authorities were unsure about the proper procedural path to follow in order to get authorization to collect GPS and ping data. (R1, DE 39 at 13.) In hindsight, they erroneously obtained a court order when they should have obtained a warrant. However, the sworn affidavits made in support of the Orders were nineteen pages and five pages long, respectively.[1] They were not "bare bones" affidavits, nor were they filled with knowing or reckless falsehoods. They detailed a wealth of information regarding the West drug operation collected over the span of many months of legal surveillance and investigation. Based on conversations recorded through the cooperation of a confidential informant, authorities obtained detailed information regarding an upcoming drug run. They also learned that they might be able to track the whereabouts of the courier known as "Big Foot" by collecting data emitted from a cell phone they had reason to believe was in his possession. This would enable authorities to seize half a ton of marijuana and potentially identify additional co-conspirators. Had these same affidavits been presented in support of an application for a warrant rather than a court order, they would almost certainly have been sufficient to establish probable cause.

There is no evidence that officers in this case engaged in any intentional misconduct; rather, it appears they made a procedural error. Officers relied in good faith on a court order, issued by a neutral and detached magistrate, which they reasonably believed authorized them to collect GPS-location information. Although proper in regard to most of the data collection it authorized, the order was later determined to be defective as to the authority to collect GPS and other location-identifying information. Nevertheless, officers had probable cause to conduct the search, and the information

---

[1] The five-page affidavit for the second order relies on and essentially incorporates by reference the nineteen-page affidavit in support of the first order.

establishing that probable cause was presented to the magistrate judge in the affidavits supporting the application for a court order. The fact that officers had probable cause means that this is not a case in which officers deliberately and wrongfully sought a court order, which requires a less demanding showing than probable cause, in the hopes of gaining some advantage to which they were not entitled. Presumably, if the document presented to the magistrate judge had been labeled an application for a warrant as opposed to a court order it would have been granted. Thus, an extension of *Leon* to the Title III order in this case would be appropriate because suppression would not serve the purpose of deterring police misconduct. On these grounds, I would affirm.